IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| JONATHAN HUNT, | § | |
|     Plaintiff | § | |
| | § | |
| VS. | § | C.A. NO. C-10-376 |
| | § | |
| MAXIMILLIANO HERRERA, et al., | § | |
|     Defendants | § | |

## OPINION AND ORDER GRANTING  MOTIONS FOR SUMMARY JUDGMENT

At the time plaintiff filed this complaint, he was is in the custody of the Texas Department of Criminal Justice-Correctional Institutions Division (TDCJ-CID) and was incarcerated at the Dominguez State Jail in San Antonio, Texas.  He was complaining about events that occurred at the Glossbrenner Unit, a substance abuse felony punishment facility ("SAFPF") in San Diego, Texas.  Plaintiff has since been released from custody and is living in Houston, Texas (D.E. 104).

Appearing *pro se*, and *in forma pauperis*, plaintiff filed this civil rights complaint pursuant to 42 U.S.C. § 1983 on October 8, 2010.  Plaintiff alleges that his constitutional rights under the Eighth Amendment to the United States Constitution were violated when prison officials were deliberately indifferent to his serious medical needs.  Pending are motions for summary judgment filed by defendant Dr. Alejandro Lopez, Jr., on January 12, 2012 and by defendants Dr. Maximiliano Herrera and registered nurse Darlene Turner on

January 13, 2012. (D.E. 73, 75, filed under seal).[1]  Plaintiff filed responses to the motions for

summary judgment on February 6, 2012 and April 6, 2012 (D.E. 78, 100).

Also pending are defendant Lopez's motion to sever the plaintiff's claims against

Herrera and Turner and to assign a new case number (D.E. 73), defendant Lopez's motion to

strike summary judgment proof (D.E. 80) and a second motion by defendant Lopez to strike

plaintiff's summary judgment proof (D.E. 101).

## JURISDICTION

This court has jurisdiction pursuant to 28 U.S.C. § 1331 and venue is proper in this

court because the actions about which plaintiff complains occurred in San Diego, Duval

County, Texas, which is located in the Southern District of Texas.

## BACKGROUND

### A.  Medical Records

The following recitation of facts is taken from the pleadings and the medical records

with the facts construed in the light most favorable to plaintiff.  In 2005, while incarcerated

at the Garza Unit, it was noted that plaintiff's prostate was "boggy" and he had rectal muscle

laxity.  His abdomen was soft, non-tender, without mass, rebound, rigidity or guarding

(Herrera/Turner Mot. Sum. Jmt, Ex. A-1, pp. 41-43;D.E. 75-2 at 43-45).  He complained that

his testicles were on fire, that he could not urinate or defecate properly and that he had pain

in his right upper quadrant.  He reported a history of bleeding ulcers (Herrera/Turner Mot.

---

[1]Defendants Herrera and Turner are represented by the Attorney General of Texas and defendant Lopez is represented by a private attorney.  Both summary judgment motions are addressed in this order.

Sum. Jmt, Ex. A-1, p. 43; D.E. 75-2 at 45).  Plaintiff was prescribed Doxycycline Hyclate,

Ferrous Sulfate, Metamucil Packets and Surfak capsules (Herrera/Turner Mot. Sum. Jmt, Ex.

A-1, pp. 43-44; D.E. 75-2 at 45-46).  He subsequently was released on parole.

Plaintiff's parole was revoked and he was sent to the Glossbrenner facility in August

2008.  When he arrived there he was complaining that he was bleeding from his rectum.  At

that time he was taking Zantac[2] and Cardura[3] (Herrera/Turner Mot. Sum. Jmt, Ex. A-1, pp.

45-47; D.E. 75-2 at 47-49).  Defendant Lopez authorized continuing the Zantac and Cardura

on August 29, 2008 (Lopez Mot. Sum. Jmt., Ex. B; D.E. 73-3 at 143).  On September 5,

2008 defendant Herrera examined plaintiff and noted that his guaiac was negative and he

had a normal size prostate.  His abdomen was soft and benign.  Herrera also noted that

plaintiff was claiming abdominal pain and wanted pain medication (Herrera/Turner Mot.

Sum. Jmt., Ex. A-1, pp. 48-49; D.E. 75-2 at 50-51).  Herrera ordered a prostate specific

antigen ("PSA") test and a urine test, both of which were within normal limits

(Herrera/Turner Mot. Sum. Jmt., Ex. A-1, p. 50, Ex. A-2, p. 51; D.E. 75-2 at 52, D.E. 75-3 at

3).

---

[2]Zantac, also known as Ranitidine, is used to treat ulcers, gastroesophogeal reflux disease and other conditions where the stomach produces too much acid. (http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000094/) (Last viewed on June 7, 2012).

[3]Cardura, also known as Doxazosin, is used to treat the symptoms of an enlarged prostate (benign prostatic hyperplasia or BPH). (http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000932/)(Last viewed on June 7, 2012).

On September 18, 2008 plaintiff complained of feeling light-headed and dizzy, having a throbbing headache, having a "rusty" taste in his mouth, abdominal pain, bloody stools, tenderness in his right upper quadrant, burning upon urination for the previous three weeks, and frequency, urgency and hesitancy with urination  (Herrera/Turner Mot. Sum. Jmt., Ex. A-2, pp. 53-58; D.E. 75-3 at 5-10).  Plaintiff saw defendant Lopez on September 25, 2008, and reported a two-year history of intermittent hematochezia,[4] treated with alcohol and cocaine, intermittent painful spastic rectum, low back pain and presyncope.  His exam was normal except for a rectal fissure[5] with a skin tag.  Dr. Lopez ordered that plaintiff undergo a colonoscopy at the prison hospital in Galveston.  He also ordered lab work and an EKG and gave plaintiff a cell pass for 72 hours (Herrera/Turner Mot. Sum. Jmt., Ex. A-2, pp. 59-60; D.E. 75-3 at 11-12).  Plaintiff's colonoscopy appointment was cancelled when Hurricane Ike struck Galveston (Herrera/Turner Mot. Sum. Jmt., Ex. A-2, p. 66; D.E. 75-3 at 18).  In November 2008 plaintiff saw defendant Lopez for rectal bleeding and it was noted that he was anemic (Herrera/Turner Mot. Sum. Jmt., Ex. A-2, p. 61; D.E. 75-3 at 13).

Plaintiff saw defendant Turner at the Glossbrenner unit on October 6, 2008, complaining about abdominal pain and that his scrotum was burning and hurting (Lopez

---

[4]Bright red blood in the stool, usually from the lower gastrointestinal tract–the colon or rectum–or from hemorrhoids. http://www.medterms.com/script/main/art.asp?articlekey=18453 (Last viewed on June 12, 2012).

[5]A rectal or anal fissure is a small tear in the skin that lines the anus and it typically causes pain and bleeding with bowel movements. http://www.mayoclinic.com/health/anal-fissure/DS00762 (Last viewed on June 12, 2012).

Mot. Sum. Jmt., Ex. B, D.E. 73-3 at 133).  Plaintiff said he was not having any trouble with his scrotum on that day, but he sometimes had swelling.  Turner noted his history of hematochezia and rectal fissure, and also that he had hemorrhoids and constipation.  His abdomen was soft with no tenderness and his bowel sounds were hypoactive in all quadrants.  Turner noted that plaintiff's urinalysis was within normal limits and that Dr. Lopez needed to review the lab work and determine what follow-up was necessary.  She also noted that plaintiff was waiting for his colonoscopy appointment in Galveston.  Finally, she told plaintiff to return to the clinic to see Dr. Lopez if his scrotum issue returned (Lopez Mot. Sum. Jmt., Ex. B, D.E. 73-3 at 133-136).

Plaintiff saw a different nurse on October 30, 2008.  He told her that he was hurting and bleeding and that the Motrin had not helped.  She noted his history of rectal bleeding. He told her that he had medicated himself the previous week with baking soda and that it helped the burning feeling in his stomach.  He had pain in his right upper and lower quadrants and said that it radiated down to his pubic area and up to his left eye.  He had abdominal tenderness in his right lower quadrant and his bowel sounds were normal.  He had a negative guaiac test (Lopez Mot. Sum. Jmt., Ex. B, D.E. 73-3 at 129-132).

Plaintiff, still at the Glossbrenner unit, saw a nurse on November 7, 2008, complaining that he was bleeding from his mouth, his vision was blurred and he was dizzy. He had no visible blood in his mouth and his vision was 20/20 (Lopez Mot. Sum. Jmt., Ex. B, D.E. 73-3 at 126-128).

Plaintiff was transferred to the Garza East Unit in November 2008.  At his health screening, he reported that he had cancer and peptic ulcers.  He also said he was having kidney and stomach problems and a growth on one testicle.  He was not taking any medications  (Herrera/Turner Mot. Sum. Jmt., Ex. A-2, pp. 62-63; D.E. 75-3 at 14-15).  On November 17, 2008 plaintiff again reported that he had been diagnosed with cancer (Herrera/Turner Mot. Sum. Jmt., Ex. A-2, pp. 64-65; D.E. 75-3 at 16-17).  On December 22, 2008 plaintiff was referred to the Galveston clinic for a colonoscopy.  The referral was expedited and he was supposed to be seen within one month.  It was noted that he had a long history of abdominal pain and rectal bleeding, that he had symptoms consistent with colon cancer and that he had been seen by teleconference, but needed an on site evaluation (Herrera/Turner Mot. Sum. Jmt., Ex. A-2, pp. 66-67; D.E. 75-3 at 18-19).

In January 2009 plaintiff was seen as an outpatient at the Galveston hospital.  He reported constant, dull, low abdominal pain and dark red blood in his stool.  He had three bowel movements per day.  His abdomen was soft with normal bowel sounds.  He was to be scheduled for a colonoscopy and a CT scan of his abdomen and pelvis (Herrera/Turner Mot. Sum. Jmt., Ex. A-2, pp. 58-69; D.E. 75-3 at 20-21).

In February 2009 plaintiff was seen by defendant Herrera at a sick call.  He reported severe abdominal pain.  The medical interview was terminated when plaintiff became belligerent and angry when complaining about a lack of medical care.  Herrera ordered blood work, a urinalysis and a PSA test (Herrera/Turner Mot. Sum. Jmt., Ex. A-2, pp. 72-73; D.E. 75-3 at 24-25).

Later in February 2009 plaintiff had a CT scan of his abdomen and pelvis.  It was noted that there was a sub-centimeter pleural based nodular density noted on the diaphragmatic surface adjacent to the dome of the liver and several sub-centimeter low attenuation lesions noted in the liver, which were too small to fully characterize.  It was thought that they might have been secondary to the suboptimal phase of contrast enhancement.  His liver was otherwise normal and he had an unremarkable, contracted gallbladder.  His spleen, pancreas and adrenals were all normal.  His kidneys were normal with a one centimeter cyst in the upper pole and exophytic from the lower pole on the right. His bowel was unremarkable.  The CT findings did not explain his complaint (Herrera/Turner Mot. Sum. Jmt., Ex. A-2, p. 74; D.E. 75-3 at 26).

Plaintiff was seen at the Garza East Unit by a mid-level provider ("MLP") in March 2009.  He reported a burning pain in his abdomen and stated that he was told he had cancer by a doctor at the Glossbrenner unit.  He also complained of difficulty urinating and defecating for the previous year.  He was prescribed psyllium fiber packets and Cardura (Herrera/Turner Mot. Sum. Jmt., Ex. A-2, p. 84; D.E. 75-3 at 36).  Plaintiff was seen at the Galveston clinic in late March 2009 and reported testicular and abdominal pain, back pain, dysuria and bloody stools (Herrera/Turner Mot. Sum. Jmt., Ex. A-2, p. 89; D.E. 75-3 at 41).

Plaintiff underwent a colonoscopy and an upper gastrointestinal examination on April 9, 2009.  The colonoscopy showed several diverticula in the cecum and one in the sigmoid colon.  Two polyps were found in the ascending colon and both were removed.  The colon was otherwise normal.  Retroflexed views in the rectum showed small internal hemorrhoids

(Herrera/Turner Mot. Sum. Jmt., Ex. A-2, p. 97; D.E. 75-3 at 49).  The upper gastrointestinal

exam showed that plaintiff's esophagus and gastroesophageal junction were completely

normal in appearance.  Multiple, small, clean-based stellate erosions were found in the body

of the stomach and biopsies were taken from the area.  Multiple superficial erosions also

were found in the antrum and biopsies were obtained.  The duodenal bulb and postbulbar

duodenum were normal in appearance as well (Herrera/Turner Mot. Sum. Jmt., Ex. A-2, p.

99; D.E. 75-3 at 51).  Biopsy of the tissue provided a final diagnosis of mild chronic gastritis

without activity, intestinal metaplasia, and tubular adenoma in the descending colon

(Herrera/Turner Mot. Sum. Jmt., Ex. A-3, p. 101; D.E. 75-4 at 3).

        Plaintiff was seen in Galveston on July 3, 2009, complaining of abdominal pain.  It

was noted that his earlier tests were within normal limits (Herrera/Turner Mot. Sum. Jmt.,

Ex. A-5, p. 201; D.E. 75-6 at 3).  He was taking Ranitidine, Doxazosin, and Ibuprofen.  The

Doxazosin and Ibuprofen were prescribed by defendant Herrera (Herrera/Turner Mot. Sum.

Jmt., Ex. A-5, p. 205; D.E. 75-6 at 7).

        In August 2009 plaintiff reported that he was bleeding through his penis.  He said that

that his clothing was soaked in blood and security was complaining about it.  The MLP

spoke with security who said they were unaware of it.  No blood was seen on plaintiff's

clothing (Lopez Mot. Sum. Jmt., Ex. B; D.E. 73-2 at 140).  Plaintiff was diagnosed with

hemorrhoids on August 27, 2009 and given Anusol cream to use twice a day for pain (Lopez

Mot. Sum. Jmt., Ex. B; D.E. 73-2 at 101).  On August 28, 2009 plaintiff walked into the

clinic to show that his boxers were bloody.  He told the nurse that he had been diagnosed

with colorectal cancer and needed to document the blood on his clothing. His boxers had a moderate amount of blood on the backside but no active bleeding was noted (Lopez Mot. Sum. Jmt., Ex. B; D.E. 73-2 at 100).

On September 10, 2009 plaintiff complained of severe pain in his scrotum and abdomen (Herrera/Turner Mot. Sum. Jmt., Ex. A-3, p. 113; D.E. 75-4 at 15). On September 30, 2009 plaintiff underwent an ultrasound of his scrotum, which showed that he had bilateral hydrocele,[6] right greater than left, and a left varicocele.[7] (Herrera/Turner Mot. Sum. Jmt., Ex. A-2, p. 34; D.E. 75-3 at 34). In December 2009 plaintiff reported that he had experienced abdominal pain for a year and more recently, lower back pain. He also said he had rectal bleeding at times, constipation and dysuria. His abdomen was somewhat tender with slight defense on the right quadrant. Lab work was ordered (Herrera/Turner Mot. Sum. Jmt., Ex. A-3, p. 119; D.E. 75-4 at 21).

In January 2010, while incarcerated at the Dominguez unit, plaintiff again complained of chronic gastrointestinal bleeding (Herrera/Turner Mot. Sum. Jmt., Ex. A-3, p. 121; D.E. 75-4 at 23). In February 2010 plaintiff asked that his work restriction be lifted.

---

[6]A hydrocele is a fluid filled sack in the scrotum. The main symptom is a painless, swollen testicle which feels like a water balloon. Hydroceles are not usually dangerous and are usually only treated when they cause discomfort or embarrassment. http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001546/ (Last viewed on June 12, 2012).

[7]A varicocele is a widening of the veins along the cord that holds up a man's testicles. A varicocele is usually harmless and does not need to be treated. http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0002263/ (Last viewed on June 13, 2012).

He said that he had thought that he had cancer.  He still complained of "bleed[ing] all the time" and said he urinated every five minutes.  The work restriction was removed and the MLP explained the previous lab results and previous gastrointestinal clinic results to plaintiff.  He was told to return to the clinic on an as-needed basis (Herrera/Turner Mot. Sum. Jmt., Ex. A-3, p. 128; D.E. 75-4 at 30).

## B.  Grievances[8]

On September 1, 2009, while at the Garza East unit, plaintiff filed a Step 1 grievance, 2009199596, complaining that he had not received needed medical care.  He did not mention any TDCJ-CID employees by name, but said that the doctor at Glossbrenner told him that he was sent to TDCJ-CID so that he could receive medical attention.  He said the testing process had taken too long and nothing had been done for his pain, loss of bodily functions, lightheadedness and dizziness.  Plaintiff received a response telling him that he had been to the Garza East Medical Department several times and had also had several specialty clinic appointments in the TDCJ Hospital in Galveston and that he was scheduled for a urology appointment in Galveston in mid-September.  His medical examinations were continuing and he was advised to continue submitting sick call requests when he felt discomfort (Complaint; D.E. 3-1 at 42-43).

Plaintiff filed a Step 2 grievance on September 4, 2009, alleging that he had been told via a letter from Program Specialist Angela Haas that if the medical department determined

---

[8]Plaintiff has submitted many grievances addressing a number of complaints.  Only those grievances where he complained about his medical care are described here.

that his medical condition was severe, his doctor could contact her and she would arrange to have him released to supervision.  When he asked defendant Lopez to contact Haas, Lopez told him that he would be better off in prison where he could be treated for free, but he had not gotten relief for his ailments.

Plaintiff received a response on November 9, 2009, telling him that his allegations had been reviewed and that records showed that he was assessed at the urology clinic in Galveston for scrotal pain and a bladder scan was completed on September 10, 2009.  It was recommended that he wear a jock strap and undergo a scrotal ultrasound.  Following an ultrasound on September 30, 2009, he was diagnosed with bilateral hydroceles and a left varicocele.  On October 6, 2009 he had signed a refusal of treatment or services to return to Galveston for follow-up care.  A second follow-up appointment was scheduled for late November 2009 and it was recommended that he attend it (Complaint, D.E. 3-1 at 44-45).

Following a transfer to the Dominguez Unit, plaintiff filed another Step 1 grievance, 2010049200, on November 18, 2009, complaining that he had been deliberately misdiagnosed by Dr. Herrera on September 5, 2008 when Herrera was filling in for Dr. Lopez.  He said Dr. Herrera noted only that plaintiff was complaining of mild abdominal pain and other vague symptoms and stopped the medications he had been taking.  Plaintiff was supposed to be "chained" to Galveston on November 15, 2009 "for whatever reason," but refused to go because the trip would be too uncomfortable for him given his ailments. He received a reply on December 14, 2009 telling him that he had not been seen in the

Dominguez unit medical department and that he should put in a sick call request so he could be evaluated (Herrera/Turner Mot. Sum. Jmt., Ex. A-1; D.E. 75-2 at 30).

Plaintiff filed a Step 2 grievance on December 17, 2009, complaining, among other things, that defendants Lopez and Herrera had not given him the consideration "an animal would have gotten in this society." Had they only contacted Angela Haas, plaintiff could have been returned to supervision where he would have been able to obtain medical care. Plaintiff received a response dated March 1, 2010 telling him that a review of his medical records showed that on August 29, 2008 he had claimed that he had rectal bleeding and that he had a prostate problem, but he did not claim that he had cancer. On September 5, 2008 a stool sample was negative for blood and his prostate was a normal size. In addition, a prostate screening test was normal. He had received a work-up, including a colonoscopy, for possible cancer and the results were negative. He had refused treatment for services in Galveston on November 16, 2009 but another appointment would be scheduled. No documentation was identified which would support the allegations plaintiff made against Herrera and Lopez (Herrera/Turner Mot. Sum. Jmt., Ex. A-1; D.E. 75-2 at 31-32).

Plaintiff also filed a Step 1 grievance, 2009018125, on September 17, 2008, complaining about events that occurred on the Dolph Briscoe unit. Although he primarily complained about a disciplinary case he received, he also complained that an unnamed nurse refused to give him pain medication when he needed it . The response did not address the lack of pain medication and plaintiff did not file a Step 2 grievance (Herrera/Turner Mot. Sum. Jmt., Ex. A-1; D.E. 75-2 at 13-14).

12

While at the Garza East unit on September 3, 2009, plaintiff filed a Step 1 grievance asserting that he had been moved to the Garza East unit so that he could get medical care but he had not received the necessary care. He also was seeking reimbursement of $5.11 that had been taken from his inmate account for medical care. The response he received addressed only his claims regarding his inmate account (Herrera/Turner Mot. Sum. Jmt., Ex. A-1; D.E. 75-2 at 23-24).

Plaintiff had filed another grievance on December 7, 2009, complaining, among other things, that Herrera had been deliberately indifferent and had misdiagnosed his severe medical condition. The grievance was rejected because he had submitted more than one grievance in seven days and because the other issue presented was not grievable (Herrera/Turner Mot. Sum. Jmt., Ex. A-1; D.E. 75-2 at 25-26).

## APPLICABLE LAW

### A.  Motion For Summary Judgment

Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. See FED.R.CIV.P. 56(c). An issue is material if its resolution could affect the outcome of the action. Daniels v. City of Arlington, 246 F.3d 500, 502 (5th Cir. 2001). The Court must examine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52, 106 S. Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). In making this determination, the Court must consider the record as a whole by reviewing all pleadings,

13

depositions, affidavits and admissions on file, drawing all justifiable inferences in favor of the party opposing the motions. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The Court will not weigh the evidence or evaluate the credibility of witnesses. Caboni v. General Motors Corp., 278 F.3d 448, 451 (5th Cir. 2002).

The movant bears the initial burden of showing the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). If the movant demonstrates there is an absence of evidence to support the nonmovant's case, the nonmovant must come forward with specific facts showing that there is a genuine issue for trial. See Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356. To sustain this burden, the nonmovant cannot rest on the mere allegations of the pleadings. See Celotex, 477 U.S. at 324, 106 S. Ct. at 2553; Caboni, 278 F.3d at 451; FED.R.CIV.P. 56(e). After the nonmovant has been given an opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted. Caboni, 278 F.3d at 451.

The usual summary judgment burden of proof is altered in the case of a qualified immunity defense. See Milchalik v. Hermann, 422 F.3d 252, 262 (5th Cir. 2005). When a government official has pleaded the defense of qualified immunity, the burden is on the plaintiff to establish that the official's conduct violated clearly established law. Id. Plaintiff cannot rest on his pleadings; instead, he must show a genuine issue of material fact

concerning the reasonableness of the official's conduct.  Bazen v. Hidalgo County, 246 F.3d 481, 490 (5th Cir. 2001).

## B.  Exhaustion of Administrative Remedies

Defendant Turner argues that plaintiff did not properly exhaust his administrative remedies with regard to her because he did not complain about her in his grievances. Plaintiff claims that he did exhaust his administrative remedies because he complained repeatedly about the process and Turner was part of the process.

The Prison Litigation Reform Act provides the following:  "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  The exhaustion requirement applies to all inmate suits about prison life, whether involving general circumstances or specific incidents.  Porter v. Nussle, 534 U.S. 516, 532, 122 S.Ct. 983, 992, 152 L.Ed.2d 12 (2002).  A prisoner is required to exhaust administrative remedies even if damages are unavailable through the grievance process.  Booth v. Churner, 532 U.S. 731, 740-741, 121 S.Ct. 1819, 1825,  L.Ed.2d 958 (2001).  A prisoner must complete the administrative review process in accordance with all procedural rules, including deadlines, as a precondition to bringing suit in federal court.  Woodford v. Ngo, 548 U.S.81, 90-91, 126 S.Ct. 2378, 2386, 165 L.Ed.2d 368 (2006).  Because exhaustion is an affirmative defense, inmates are not required to plead or demonstrate exhaustion in their complaints. Jones v. Bock, 549 U.S. 199, 216, 127 S.Ct. 910, 921, 166 L.Ed.2d 798 (2006).

The TDCJ-CID currently provides a two-step procedure for presenting administrative grievances.  Step 1 requires the prisoner to submit an administrative grievance at the institutional level.  Wendell v. Asher, 162 F.3d 887, 891 (5th Cir. 1998) (citing to TDCJ Administrative Directive No. AD-03.82 (rev. 1), Policy, ¶ IV (Jan. 31, 1997)).  After an investigation, the unit grievance investigator prepares a report and makes a recommendation to the final decision maker, which may be the warden, assistant warden, facility administrator, assistant facility administrator, or health administrator.  Id.  Step 2 permits the prisoner to submit an appeal to the division grievance investigator with the Institutional Division of the TDCJ.   Id.  After an investigation, the departmental grievance investigator prepares a report and makes a recommendation to the final decision maker for Step 2 of the process, which is the director, deputy director, regional director or assistant director.  Id.

The primary purpose of the exhaustion requirement is to provide prison officials with "time and opportunity to address complaints internally."  Johnson v. Johnson, 385 F.3d 503 (5th Cir. 2004) (quoting Porter, 534 U.S. at 525).  As acknowledged by the Supreme Court, Congress intended the administrative process to "filter out some frivolous claims and foster better-prepared litigation once a dispute did move to the courtroom, even absent formal factfinding."  Booth, 532 U.S. at 737, 121 S.Ct. at 1823.

The Fifth Circuit discussed how much detail is necessary in a prison grievance form in Johnson.  The Court noted that it has given relatively little guidance on what a prisoner must say in a grievance to properly exhaust his claims and added that as a general matter,

16

courts typically use a standard according to which a grievance should give prison officials

fair notice of the problem that will form the basis of the prisoner's suit.

> In deciding how much detail is required in a given case, we believe that a court must interpret the exhaustion requirement in light of its purposes, which include the goal of giving officials time and opportunity to address complaints internally.  Thus, a grievance should be considered sufficient to the extent that the grievance gives officials a fair opportunity to address the problem that will later form the basis of the lawsuit.

Id. at 516-517 (internal quotations and citations omitted).  The court added that as a practical

matter, the amount of information necessary in the grievance would depend on the nature of

the complaint.  If an inmate were complaining about the actions or inactions of a particular

prison employee, he would ordinarily be expected to provide details regarding the identity of

the employee and facts regarding the incident.  In contrast, if the inmate were complaining

more generally about something like vermin in his cell or high prices in the commissary, the

prison would be able to investigate the situation even if specific employees were not named.

Id. at 517.

Defendant Turner is never mentioned by name in any of plaintiff's grievances.  In

one Step 1 grievance he complained that he asked a nurse for some pain medication but she

refused to give it to him, claiming she could not give him medication for pain because of the

nature of the treatment facility (Herrera/Turner Mot. Sum. Jmt., Ex. A-1; D.E. 75-2 at 13).

Proper exhaustion of a claim does not necessarily require that a defendant be named during

the grievance procedure.  Jones, 549 U.S. at 218-219, 127 S.Ct. at 922-923.  However, the

response to plaintiff's Step 1 grievance did not address the failure to provide pain

medication and plaintiff did not file a Step 2 grievance.  Without having done so, he cannot

be said to have exhausted his administrative remedies with regard to defendant Turner,

assuming she is the nurse about whom he was complaining.  Therefore, his claims against

defendant Turner are dismissed for failure to exhaust his administrative remedies.

## C.   42 U.S.C. § 1983

Notwithstanding the fact that plaintiff failed to exhaust his administrative remedies

with regard to Turner, in the alternative plaintiff's § 1983 claims against her are dismissed

along with his claims against Herrera and Lopez because he has failed to overcome the

defendants' assertions of qualified immunity.  To state a claim under §1983 a plaintiff must

(1) allege violation of a right secured by the Constitution or laws of the United States and (2)

demonstrate that the alleged deprivation was committed by a person acting under color of

state law.  Moore v. Willis Independent School District, 233 F.3d 871, 874 (5th Cir.

2000)(citing Leffall v. Dallas Ind. Sch. Dist., 28 F.3d 521, 525 (5th Cir. 1994)).

Claims under § 1983 may be brought against persons in their individual or official

capacities, or against a governmental entity.  Goodman v. Harris County, 571 F.3d 388, 395

(5th Cir. 2009)(citing Board of County Comm'rs of Bryan County v. Brown, 520 U.S. 397,

403, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997)).  "Personal-capacity suits seek to impose

liability upon a government official as an individual while official-capacity suits 'generally

represent only another way of pleading an action against an entity of which an officer is an

agent.'" Id. (citing Monell v. Dept. of Soc. Serv's of City of New York, 436 U.S. 658, 690,

n. 55, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)).  In a personal-capacity suit, the individual

defendant may assert personal immunity defenses such as qualified immunity.  Plaintiff in this case named Herrera, Lopez and Turner as defendants in their personal capacities.

### D.  Qualified Immunity

The doctrine of qualified immunity affords protection against individual liability for civil damages to officials "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Pearson v. Callahan, 129 S. Ct. 808, 815, 172 L.Ed.2d 565 (2009)(quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)).  When a defendant invokes the defense of qualified immunity, the burden shifts to the plaintiff to demonstrate the inapplicability of the defense.  McClendon v. City of Columbia, 305 F.3d 314, 323 (5th Cir. 2002)(en banc).  To discharge this burden, the plaintiff must satisfy a two-prong test. Atteberry v. Nocona Gen. Hosp., 430 F.3d 245, 251-52 (5th Cir. 2005).  First he must claim that the defendants committed a constitutional violation under current law.  Id. (citation omitted).  Second, he must claim that defendants' actions were objectively unreasonable in light of the law that was clearly established at the time of the actions about which he complains.  Id.  While it will often be appropriate to conduct the qualified immunity analysis by first determining whether a constitutional violation occurred and then determining whether the constitutional right was clearly established, that ordering of the analytical steps is no longer mandatory.  Pearson, 129 S. Ct. at 818 (receding from Saucier v. Katz, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)).

### E.  Deliberate Indifference

Prison officials are liable for failure to provide medical treatment if they are deliberately indifferent to a prisoner's serious medical needs.  Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285 (1976).  Deliberate indifference may be exhibited by prison doctors in their response to prisoners' needs, but it may also be shown when prison officials have denied an inmate prescribed treatment or have denied him access to medical personnel capable of evaluating the need for treatment.  Id., 429 U.S. at 104-05, 97 S.Ct. at 291.  A prison official acts with deliberate indifference if he knows that an inmate faces a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it.  Farmer v. Brennan, 511 U.S. 825, 847, 114 S.Ct. 1970, 1984, 128 L.Ed.2d. 1970 (1994).

A plaintiff must show that the official refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in similar conduct that would clearly evince a wanton disregard for his serious medical needs.  Domino v. Texas Department of Criminal Justice, 239 F.3d 752, 756 (5th Cir. 2001)(citations omitted).  Although inadequate medical treatment may, at some point, rise to the level of a constitutional violation, malpractice or negligent care does not.  Stewart v. Murphy, 174 F.3d 530, 534 (5th Cir. 1999)(citations omitted).  Deliberate indifference encompasses only unnecessary and wanton infliction of pain repugnant to the conscience of mankind.  McCormick v. Stalder, 105 F.3d 1059, 1061 (5th Cir. 1997)(citations omitted).  "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."  Estelle, 429 U.S. at 106, 97 S.Ct. at 292. In addition, "a delay in medical care can only constitute an Eighth Amendment violation if

there has been deliberate indifference, which results in substantial harm." Mendoza v. Lynaugh, 989 F.2d 191, 195 (5th Cir. 1993).

### 1. Defendant Herrera

Plaintiff asserts that defendant Herrera violated his Eighth Amendment right to be free of cruel and unusual punishment when he was deliberately indifferent to plaintiff's serious medical needs. Plaintiff claims that Herrera discontinued medications plaintiff was taking and refused to give him any treatment, pain medication or help.

The summary judgment evidence shows that when Herrera saw plaintiff on September 5, 2008 he noted that plaintiff was claiming abdominal pain and many other vague symptoms and wanted pain medication. Upon examination, his abdomen was soft and benign, his prostate was normal size and his guaiac was negative. Herrrera ordered lab work which was within normal limits. The evidence does not show that Herrera refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in similar conduct that evinced a wanton disregard for plaintiff's serious medical needs.

Plaintiff says that Herrera discontinued the medications plaintiff was taking. On August 29, 2008 plaintiff was taking Zantac and Cardura. He saw Herrera a week later, on September 5, 2008, but there is no mention of medications. When plaintiff was seen on September 18, 2008, the only medication noted was Bactrim,[9] presumably prescribed by

---

[9]Bactrim, also known as Co-trimoxazole Oral, is a sulfa drug that eliminates bacteria that causes various infections, including infections of the urinary tract, lungs, ears and intestines. It is also used to treat "travelers' diarrhea." http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000814/ (Last viewed on June 11, 2012).

Herrera (Herrera/Turner Mot. Sum. Jmt., Ex. A-2, pp. 53, 55, 57; D.E. 75-3 at 5, 7, 9).

When plaintiff saw Dr. Lopez a month later on October 16, 2008, he was prescribed Motrin,

800 mg. (Lopez Mot. Sum. Jmt., Ex. B, D.E. 73-2 at 175).  While plaintiff's medications

were changed over the course of his visits, nothing in the record supports the allegation that

they were changed for any reason other than in an attempt to treat plaintiff's various

ailments.  He has pointed to no evidence, and none was found, to support a conclusion that

Herrera changed plaintiff's medications in an effort to treat him incorrectly or cause him

harm in any way.  Under these circumstances, plaintiff cannot overcome Herrera's

entitlement to qualified immunity and summary judgment is entered for Herrera.

### 2. Defendant Turner

Plaintiff claims that defendant Turner told him that he was too sick to be at the

Glossbrenner Unit and that there was nothing they could do for him there.  He also claims

that she denied him pain medication, telling him that because she did not know the nature of

his illness, she could not give him any pain medication.  Plaintiff also said that another time

Turner stopped his pain medication because of "substance abuse rules."

None of the allegations against defendant Turner, even if true, rises to the level of

deliberate indifference.  It may well have been true that the Glossbrenner Unit was not

equipped to address plaintiff's medical needs but he has not shown that defendant Turner

had any authority over where he was housed or that she impeded his transfer to another unit.

Also, as demonstrated by the medical records, the cause of plaintiff's abdominal pain and

other symptoms was unknown.  It was not deliberately indifferent for Turner to not give

plaintiff pain medication which could have made his condition worse.  In addition, plaintiff

stated that Turner told him that she could not override the doctor's decision to not give him

pain medication (Declaration of Jonathan Hunt, Ex. A; D.E. 100-1 at 1).  Nothing in the

record indicates that Turner had the authority to give him pain medication if the doctor did

not prescribe it.  Nor was Turner deliberately indifferent for not giving him pain medication

if the use of such medication was forbidden on the unit because it was a substance abuse

treatment facility.

Moreover, when Turner saw plaintiff in October 2008, she examined him, performed

a urine test and noted that Dr. Lopez needed to review the lab results and determine the need

for a follow-up appointment.  She also told plaintiff to return via a sick call request if his

scrotum issue returned (Lopez Mot. Sum. Jmt., Ex. B; D.E. 73-3 at 134).  This behavior does

not support a conclusion that Turner was deliberately indifferent to plaintiff's serious

medical needs.

Finally, plaintiff claims that Nurse Turner was deliberately indifferent to his medical

needs when she refused to contact Angela Haas, the program specialist with TDCJ who had

told plaintiff that if the medical department at the Glossbrenner unit recommended that he be

terminated from the program, she would ask that he be returned to supervision.  Plaintiff

claims that he asked Turner to contact Haas but she said that if Lopez were not going to

contact Haas, she (Turner) was not going to contact Haas.  It is unclear whether Turner had

the authority to make a recommendation that plaintiff be terminated from the substance

abuse treatment facility for medical reasons.  However, even if she had the authority and

refused to do so, such a refusal does not lead to the conclusion she was deliberately indifferent to plaintiff's medical needs.  Rather it indicates that she did not believe that his medical condition precluded him from participating in the treatment program.

For all of these reasons, plaintiff has not overcome Turner's defense of qualified immunity.  Summary judgment is entered for her on all of plaintiff's claims.

### 3.  Defendant Lopez

Plaintiff alleges that defendant Lopez was deliberately indifferent to his serious medical needs because he diagnosed him with cancer and then refused to contact Haas so that plaintiff could be returned to supervision.  Plaintiff also complains that Lopez refused to give him pain medication.

It is important to note that Lopez did not diagnose plaintiff with cancer and that plaintiff has never been diagnosed with cancer.  Lopez diagnosed plaintiff with a rectal fissure and hematochezia, but also referred plaintiff for a colonoscopy, presumably to rule out other causes of rectal bleeding.  There was no reason for Lopez to contact Haas so that plaintiff could be released from the SAFPF and returned to supervision because he could be adequately treated while in prison.  While it is unfortunate that Hurricane Ike struck Galveston and caused an approximately six-month delay in plaintiff receiving a colonoscopy to definitively rule out cancer, plaintiff cannot show that he was harmed by the delay in the testing.  Plaintiff ultimately was diagnosed with diverticula in the cecum and sigmoid colon and with two polyps which were removed.  He also had superficial erosions in his stomach. In addition he had small internal hemorrhoids.  Plaintiff also has been diagnosed with

bilateral hydrocele and a varicocele.  Plaintiff was prescribed medication for these
conditions (Lopez Mot. Sum. Jmt., Ex. B; D.E. 73-2 at 112).  Also, while Lopez may not
have given plaintiff pain medication when he first saw him in September 2008, he prescribed
pain medication in October 2008 (Lopez Mot. Sum. Jmt., Ex. B; D.E. 73-2 at 175).

There is no evidence in the record to support plaintiff's claims that Lopez was
deliberately indifferent to his serious medical needs.  To the contrary, Lopez examined
plaintiff, made a diagnosis, sought further testing to rule out other conditions and prescribed
medications he deemed necessary to treat plaintiff's ailments.  On these facts, plaintiff
cannot overcome Lopez's defense of qualified immunity.  Summary judgment is entered for
Lopez on all of plaintiff's claims.

**F.  Negligence Claims**

Defendant Lopez also moved for summary judgment on plaintiff's negligence claims.
However, it does not appear that plaintiff has filed, or attempted to file, a negligence cause
of action (See Complaint, D.E. 3).  This conclusion is drawn for several reasons: (1)
Although plaintiff broadly mentions "medical neglect" in his complaints against Drs.
Herrera and Lopez, he never details the elements of a cause of action for medical
malpractice nor does he supply any theories of how or why the doctors' conduct amounts to
negligence; (2) plaintiff filed his claims on a § 1983 form (constitutional tort) and discussed
in detail the actions of the doctors plaintiff believed amounted to "deliberate indifference,"
without ever mentioning medical negligence or breach of duty; (3) plaintiff did not complain
about the failure of the original order dismissing claims and retaining case to address any

alleged claims of negligence; (4) plaintiff failed to submit an expert's report and affidavit *required* to be filed pursuant to § 74.351of the Tex. Civ. Prac. & Rem. Code in a medical malpractice case; and (5) plaintiff failed to address defendant Lopez's arguments regarding negligence in his response to the motion for summary judgment.

In any event, the summary judgment evidence conclusively refutes any negligence on the part of either Dr. Herrera or Dr. Lopez.  The essential elements of a negligence cause of action are (1) a duty by the physician to act according to a certain standard; (2) a breach of the applicable standard of care; (3) an injury; and (4) a causal connection between the breach of care and the injury.  Nowzaradan v. Ryans, 347 S.W.3d 734, 740 (Tex.App.-Houston [14[th] Dist.] 2011).  The expert affidavits provided through summary judgment conclusively refute that the doctors breached any applicable standard of care, that any injury resulted, or that the breach caused an injury.  Plaintiff provided no expert report to the contrary.  His personal belief or opinion is not sufficient to refute the expert reports.

## G.  Other Pending Motions

Defendant Lopez's motion to sever plaintiff's claims against Herrera and Turner and to assign a new case number (D.E. 73) is denied as moot.  Defendant Lopez's motions to strike summary judgment proof (D.E. 80, 101) are denied.  To the extent plaintiff submitted evidence which was not adequate summary judgment proof, it has not been considered.

### CONCLUSION

Based on the foregoing, defendants' motions for summary judgment (D.E. 73, 75) are GRANTED.  Summary judgment is entered for defendant Turner because plaintiff failed to

exhaust his administrative remedies with regard to her and, in the alternative, because she is entitled to qualified immunity.  Summary judgment is entered for defendants Herrera and Turner because they are entitled to qualified immunity.  To the extent plaintiff intended to pursue negligence claims against defendants Herrera and Lopez, they are entitled to summary judgment based upon the record before the court.  Defendant Lopez's motion to sever plaintiff's claims against Herrera and Turner (D.E. 73), and motions to strike summary judgment proof (D.E. 80, 101) are DENIED.

     ORDERED this 18th day of June, 2012.

 

     B. JANICE ELLINGTON
     UNITED STATES MAGISTRATE JUDGE